### DULUTH LUMBER Co. *v.* ST. LOUIS BOOM & IMPROVEMENT Co.

*(Circuit Court, D. Minnesota. 1883.)*

1. ST. LOUIS BOOM & IMPROVEMENT COMPANY — ACT OF 1872 OF MINNESOTA — RIGHT TO COMPENSATION.

   The act of the legislature of Minnesota, of February 24, 1872, relating to the Knife Falls Boom Corporation, authorizes the St. Louis River Boom Company to receive, control, scale, deliver, and to take charge of all loose logs coming down the river within townships Nos. 49 and 50,—in fact, makes them bailees of such logs, with certain duties to perform in regard thereto; and the owners of such logs, whether they have requested the services or duties to be performed or not, are bound to compensate the company therefor.

2. SAME—CONSTITUTIONALITY OF SUCH ACT.

   Such an act of the legislature is not unconstitutional.

3. NAVIGABLE STREAMS—STATE LAWS.

   Statutes passed by the states for their own uses, declaring small streams navigable, do not make them so within the meaning of any constitutional provision, treaty, or ordinance of the United States.

4. NORTH-WESTERN TERRITORY — ORIGINAL ACT — EFFECT OF ADMISSION OF STATE.

   The original ordinance concerning the north-western territory ceased to be of any force when congress, and a state organized out of such territory, chose to organize and admit such state into the Union.

At Law.

Before MILLER and NELSON, JJ.

MILLER, Justice.   We have arrived at a satisfactory conclusion in regard to the case of the Duluth Lumber Company against the St. Louis Boom & Improvement Company, submitted to us without a jury a few days ago.   The case made by the plaintiff is that it is the owner of a considerable lot of logs which came into the possession of the defendant, the boom company, and that they are entitled to the present possession of them, and have made a demand, which was refused.   The facts seem to be that the Duluth Lumber Company had logs above the location of the boom company, which were run down singly and irregularly, and came within the limits of the boom company's corporate territory, and were taken possession of by that company, and certain acts performed with regard to them, such as scaling them, helping them over the rocky places within the limits of the boom company's domain, and finally delivering all of them to the lumber company, except some that they retained on account of a lien for the services to the whole of them.   This lien on the logs that

they retained is the subject-matter of controversy. It is denied by the plaintiff, the lumber company, that any statute exists authorizing the boom company to take these logs without the consent of the owner, and to do anything about them without such consent. It is denied that the statute confers any such authority, and it is denied that if the statute intended to confer any such authority, that it is in that respect warranted by constitutional law.

The first question, then, to be considered is whether the statute confers any such authority. The statute which governs the matter is "An act relating to the Knife Falls Boom Corporation," in Carlton county, which is found in the Laws of Minnesota, *c.* 106, p. 454, and of the date of February 29, 1872. The statute is a long one, and I do not deem it necessary to read much of it. It creates the corporation, in the first place, and describes the geographical limits within which it shall exercise its powers. These are in townships 49 and 50, range 17, in Carlton county. It recognizes their public character, authorizes them to take the land that may be necessary for the purposes of their organization, by condemnation under the power of eminent domain, and almost two-thirds of the act is devoted to the manner in which this land shall be condemned, and its value ascertained and paid for. The second section of the act is the one which confers the power, and before I read it I wish to state that the argument is that where this section says that the company shall take and receive all logs coming within those two townships, it does not mean that, but it means all such logs as the owner shall desire them to boom, and to receive and take charge of. •That is the argument; and, as re-enforcing that argument, it is said that no statute of the kind has ever been held to include *all* logs, but that all statutes in regard to boomage provide that a way shall be kept open for parts of logs, for boats, for navigation,—where the stream is navigable,—for rafts, and other things of the kind, and therefore it cannot mean *all* logs, but that a way shall be kept open for all that the owners do not desire shall go into the boom.

Now, in view of that argument, there is an important proviso to this section, which shows what exceptions the legislature intended to make to the phrase "all logs" coming into that boom:

Sec. 2. "That said corporation is authorized and required to construct, maintain, and keep in reasonable repair, such booms in and upon the St. Louis river, within said towns 49 and 50, of range 17, aforesaid, at such points as it may deem advisable and sufficient to secure, receive, scale, and deliver all logs that may from time to time come or be driven within the limits of the town aforesaid, and the said corporation is hereby authorized and required to receive and take the entire control and possession of all logs and timber which may be run, come, or be driven within the limits aforesaid, and boom, scale, and deliver the same as hereafter provided; that all logs and timber which shall be floated or run down the St. Louis river or the tributaries thereof, from points above said town, be in the possession of, and under the control of, said corporation, for the purpose of securing, scaling, and delivering the same as in its acts provided"

Now, it would be very difficult to make this more comprehensive: "all the logs that come from above and in any manner come into the boom of the defendants within those townships;" but to show that it did mean all logs not expressly excepted, there is this proviso:

"That all vessels or crafts navigating said river St. Louis, and all rafts of logs or timber made up at points above the limits of town 50, aforesaid, and destined for points south of town 49, aforesaid, shall be allowed free passage upon said river, and the said corporation shall not be allowed to obstruct the channel of said river so as to interfere with the free navigation thereof as aforesaid."

Now, that is so plain that it astonishes me that there should be any controversy about it; that all loose logs set afloat in the river, coming down into that township and caught in these booms, are within the meaning of this act. All logs that are rafted up above, and all steam-boats or any kind of vessel navigating the river, are not to be taken, but the boom men are to provide a free way for them to go through. There is no argument about it. They use language as clear as possible for a human being, in the use of language, to say that all the loose logs that come into this boom are to be received and cared for, and under their control; *all rafts* and *vessels*, and everything of the kind, shall go free; and the boom men shall provide a way for them to do it.

In opposition to this view of the subject, some language of Judge FIELD, in delivering the opinion of the supreme court of the United States in the case of Patterson against the boom company, is adduced. The language itself does not necessarily imply anything contrary to the views here suggested, but what he was saving was so remote, he was so little called upon to determine that question in the construction of that statute, that it could have but little weight even if that was his meaning. He was there considering a question of the value of a certain piece of land, which was condemned under a similar statute to this, for boom purposes, by a boom company, and he went on to say or argue that the owner of that land would have a right to make a boom himself, and therefore, although it was of no value for anything else but a boom, that that value must be considered as one of the elements of the damages sustained, and this question, of what the legislature meant by this statute, could have so very little to do with it, that, as a construction of the statute, it could have no binding force on anybody.

A decision in the supreme court of the state of Maine is also presented. I only got the sense of it as it was read by counsel in the argument, but it was so clear that that statute itself, from the argument of the court, did provide for a free way for everybody that did not want their logs boomed, that it cannot have any application to this case.

I am of the opinion, therefore, that the statute of Minnesota does authorize this St. Louis River Boom Company to receive, control,

scale, deliver,—to take charge of all loose logs coming down the river within those two towns, 49 and 50. Another part of the statute, that shows that that is so, makes them liable, or implies their liability as bailees. The fact is that they are created bailees of these logs for specific purposes, and, as such bailees, they would be liable for the loss of the logs, or for an injury to them, as for their being burned up, (if we can suppose such a thing to happen to logs in a boom,) and for the unjust detention of them for a longer time than was necessary to perform the functions that they are authorized to perform. ·And that such is the view of it is evidenced by the proviso to section 3: "That when the water in said river shall be so low that logs cannot be turned out of said booms, or rafted in consequence of such low stage of water, the said corporation shall not be required or held accountable for the non-delivery of any logs that may, during such time, be in such booms, or either of them, until there shall be sufficient water to enable said company to raft,"—that is one of the things they are authorized to do,—which it is their duty to do,—"to raft, turn out, or deliver the same; and provided also, the said company shall not be liable for any damage caused by any extraordinary rise of water or freshets." They are bailees, with the absolute control of these loose logs, with certain duties to perform. And this proviso relieves them from the legal obligation of bailees, in certain contingencies.

Now, is that law unconstitutional, or is it void because the consent of the owners is neither given by express words nor by implication to the turning of their logs into this boom, or into the possession which the boom-owners take of them? I am not referred to any provision of the constitution of Minnesota providing for the invalidity of such an act. Therefore I shall presume that there is no such provision.

It is hardly asserted—(although the argument goes mainly to that) —it is hardly asserted that the statute, if construed as I construe it, is void, although it is said so in the argument; and I do not see any solid foundation for such a proposition to rest upon. Here is a stream of a very peculiar character, whose only value, as a means of transportation, is that it can carry logs and lumber from above down to its mouth. That value, however, is a very great one, because there is a vast lumbering region on that river above these booms, and the natural and only reasonable outlet for those logs to get to a place where they can be rafted, and thence propelled in safe water, is through this river and through these booms. It may be supposed—it *must* be supposed—that the legislature had some information of the nature and character of the river, its obstructions, (if there were any,) its difficulties within these two townships,—because they point out these two townships specifically, and describe them; and it is only within these limits that the defendant's operations can be carried on. There are hundreds of persons interested in the business of lumbering

above these two townships on that river; there are millions of feet of lumber to be cut and carried down there, and the only practical way is that they shall be floated on the waters of that river through these boom limits, and out into that part of the St. Louis bay or St. Louis river which is safe water. These persons have no community of action. They cut when they please, how much they please, and in such order as may suit themselves. They cannot carry these logs, and they cannot raft them above, because, as I understand, no raft can go over these obstructions; they must go down through these booms singly, or at least not fastened together in rafts. If they cannot be rafted, they are marked, by the provision of the statute in its express terms. It is, then, these loose logs that are set afloat by everybody, with no other mode of recognizing the property than by some artificial mark put upon them, with many owners' logs running together, and all going into this particular place,—going into a place where, as the testimony shows, it was necessary, in many instances, for somebody to turn them off of the rocks which obstructed them; to start them afloat when they were stopped by those natural obstructions; to see that they did not collect in great bodies, as they do in some of the lower rivers, and make miles and miles of obstructions that are of no use to anybody; to gather them together; to take care of them in this perilous part of their transit down this river. Now, for the legislature to say that you shall make a boom that will catch all these logs, that will enable you to perform a necessary duty about all these logs, and that you must do your duty with regard to all of these logs, (because the owner is not sending somebody down with every log that floats;) for the legislature to say that you must be careful that you touch nobody's logs that has not employed you to do it; that you shall gather together in that boom and take care of and scale and deliver to the owner no other logs than those of which the owner has requested you to do,—is to simply enjoin an impossibility. It is simply to say that no such boom shall be made. It is to say that it shall not be used, because no boom-owner can do that. But the legislature has assumed that all these log-owners have a common interest,—that is, that their logs should get safely through that place; that they should be identified and marked; that they should be scaled there, and that they might be, if needed, rafted there; and that they might and must be, by these boom-owners, delivered to their proper owners. Now, for that service the legislature has a right to require compensation (whether the owner requests it or not) in the exercise of the duty of these boomers towards everybody that has that common interest. It has a right to say that, whether you want to pay for it or not, whether you want your logs so handled or not, since you put them into this common way, this common stream, this common mode of conveyance, and mix them, without other people's consent, with other people's logs, run them in together, without consulting anybody's interest but your own, you

shall pay your reasonable share for this duty performed by the boom company.

The principle is not an uncommon nor an unusual one. It has been asserted in many cases, and no better instance can be suggested (that has often been before the courts) than the one suggested, on the argument, of the case of a pilot. In the sea ports of this country, and the sea ports of all nations, it has been found necessary that a body of men skilled in piloting the narrow and tortuous channels which lead to ports or harbors should exist. It is for the good of all concerned in commerce that such a body should exist. They must be paid also by the vessels or the parties who need their services, and who use them, and it has been the custom and the law, from time immemorial, that this body of men shall be taken, in the order in which they present themselves to the ship. A pilot is always found outside of the entrance to a harbor. He stays there, and it is his duty to be there, and his right. It is his right to be taken by that ship and paid by that ship, and if the ship refuses to take him, choosing to use a pilot of her own, the laws make her pay either whole pilotage or half pilotage, just the same as though he had performed the service, and the reason of the rule has never been disputed. It cannot be disputed, because, in the pursuit of a common interest, for the benefit of a whole community, the parties who might have the use of the pilot, the parties for whom the service is provided, are to pay for it whether used or not.

Something is said in this case about the organic law admitting the state into the Union; about the old act for the government of the north-western territory. We have long ago decided that the original act concerning the north-western territory ceased to be of any force when congress and the state chose to organize and admit the state into the Union. That ordinance, then, is of no force in such a state. Nor do I think it worth while, myself, to notice the argument about the provision in the law admitting Minnesota into the Union; about all navigable streams being preserved for the use of the citizens of the different states free of toll. This is no toll for navigation, in the ordinary sense. The word "navigation," in all the statutes of the United States, and in the constitutions and all the treaties, does not mean the running of saw-logs down a river; and that is about all that is necessary to say.

We are of the opinion that the action in this case is not sustainable, and judgment will be rendered for the defendant.

It is proper to say that many statutes of many states, for the very purpose of preserving these small streams for the use of saw-logs and various kinds of smaller water-craft, declare such streams navigable. There is hardly a stream in the western country that can float a log that has not, by statute of the state, been declared to be navigable, to prevent people from putting dams across it; but that has nothing to do with the great point of the navigability of streams of the United States

concerning interstate navigation or international navigation. Those are statutes made by the states for their own uses, and they can declare, and often do declare, that a little branch is a navigable stream. That does not make it so, within the meaning of any constitutional provision, treaty, or ordinance of the United States.